1

2

3

4

5

6

7

8

9                    IN THE UNITED STATES DISTRICT COURT

10                      FOR THE DISTRICT OF OREGON

11                        PORTLAND DIVISION

12   DAVID A. BROWN,                    )
                                        )
13                   Plaintiff,         )
                                        )    No.  CV-09-585-HU
14        v.                            )
                                        )
15   MICHAEL J. ASTRUE,                 )
     Commissioner of Social            )
16   Security,                          )    FINDINGS & RECOMMENDATION
                                        )
17                   Defendant.         )
     _____)
18
     Tim Wilborn
19   WILBORN LAW OFFICE, P.C.
     P.O. Box 2768
20   Oregon City, Oregon 97045

21        Attorney for Plaintiff

22   Dwight C. Holton
     ACTING UNITED STATES ATTORNEY
23   District of Oregon
     Adrian L. Brown
24   ASSISTANT UNITED STATES ATTORNEY
     1000 S.W. Third Avenue, Suite 600
25   Portland, Oregon 97204-2902

26   / / /

27   / / /

28   / / /

     1 - FINDINGS & RECOMMENDATION

Leisa A. Wolf
SPECIAL ASSISTANT UNITED STATES ATTORNEY
Office of the General Counsel
Social Security Administration
701 5th Avenue, Suite 2900 M/S 901
Seattle, Washington 98104-7075

        Attorneys for Defendant

HUBEL, Magistrate Judge:

        Plaintiff David Brown brings this action for judicial review of the Commissioner's final decision to deny disability insurance benefits (DIB) and Supplemental Security Income (SSI).  This Court has jurisdiction under 42 U.S.C. § 405(g) (incorporated by 42 U.S.C. § 1383(c)(3)).  I recommend that the Commissioner's decision be reversed and remanded for additional proceedings.

PROCEDURAL BACKGROUND

        Plaintiff applied for DIB and SSI on May 3, 2005, alleging an onset date of June 4, 2004.  Tr. 55-57, 59, 187-89.  His applications were denied initially and on reconsideration.  Tr. 23-29, 177-86.

        On January 30, 2008, plaintiff appeared for a hearing before an Administrative Law Judge (ALJ).  Tr. 190-222.  On March 26, 2008, the ALJ found plaintiff not disabled.  Tr. 12-22.  The Appeals Council denied plaintiff's request for review of the ALJ's decision.  Tr. 5-7.

FACTUAL BACKGROUND

        Plaintiff alleges disability based on bipolar disorder and depression.  Tr. 63.  Tr. 67.  At the time of the January 30, 2008 hearing, plaintiff was forty-six years old.  Tr. 197.  Plaintiff has a GED.  Id.  Plaintiff has past relevant work as an optical instrument assembler, a semi-truck driver, a delivery route driver,

2 - FINDINGS & RECOMMENDATION

1   and a material handler.  Tr. 215-16.

2   I.  Medical Evidence

3       The first medical record in the Administrative Record is a
4   March 22, 2005 emergency room report from Three Rivers Community
5   Hospital.  Tr. 131-32.  The chief complaints noted are acute
6   intoxication and acute depression.  Tr. 131.  In the narrative, Dr.
7   Janet Eoff, M.D., notes that plaintiff had a long history of
8   alcohol abuse, was sober for a few months several years ago, but
9   has been drinking heavily for quite some time.  Id.  Plaintiff
10  expressed a desire to quit.  Id.  He smelled strongly of alcohol.
11  Id.  His extremities were normal, but with a mild tremor.  Id.
12  Plaintiff was tearful and mildly agitated, and reported thinking
13  about suicide although he did not have a plan.  Id.

14      Plaintiff was given a mix of intravenous fluids containing
15  vitamins and minerals, as well as an antihistamine.  Id.  He was
16  also given an anti-anxiety medication.  Id.  Plaintiff did not meet
17  the criteria for an involuntary hold.  Id.  He signed a no-harm
18  contract and agreed to go to the "Ray Allen Center."  Id.  He was
19  prescribed Librium to take and reported feeling much better on
20  discharge.  Tr. 132.

21      On March 31, 2005, plaintiff saw Dr. Kristin Miller, M.D., at
22  the Siskiyou Community Health Center in Grants Pass, Oregon.  Tr.
23  139-40.  He came in to be evaluated for depression, which he
24  described as an episodic depression he had experienced for years.
25  Tr. 139.  He described his life as being full of highs and lows.
26  Id.  He reported past suicidal ideation, a long history of insomnia
27  and difficulty sleeping, and alcohol and drug abuse.  Id.  He
28  reported having previously been treated with Zoloft, an

3 - FINDINGS & RECOMMENDATION

antidepressant medication, which he said he stopped taking when he felt better. Id. He came to see Dr. Miller because of the previous week's incident where, he reported, "he nearly drank himself to death[.]" Id.

Dr. Miller noted that plaintiff's past medical history form illustrated a "very rambling history circling around with the answers literally circling around the page." Id. Plaintiff's mood disorder questionnaire was positive on every item. Id.

Dr. Miller assessed plaintiff as having bipolar disorder, previously untreated, but fairly classic by plaintiff's description, and alcoholism, currently in short term remission. Id. Dr. Miller stressed to plaintiff the importance of mood stabilizing drugs in addition to antidepressants. Tr. 140. She explained that if only the depression were treated, it would not stabilize his mood. Id. She remarked that "[c]ost is of concern but generic fluoxetine may be available." Id. She started him on Symbyax, a drug containing both fluoxetine, an antidepressant, and olanzapine, an antipsychotic medication. Id. She was able to provide samples of the medication. Id. She advised him to continue to taper off the Librium. Id.

Plaintiff next saw Dr. Miller two weeks later, on April 14, 2005. Tr. 138. Plaintiff complained of diarrhea while taking the Symbyax, and feeling "twitchy." Id. He had stayed sober. Id. Dr. Miller thought that the diarrhea could have been due to the fluoxetine portion of the Symbyax, and she switched him to only olanzapine (under the brand name Zyprexa), with the idea that if plaintiff tolerated that, she would add some low dose Zoloft to address the need for an antidepressant. Id.

4 - FINDINGS & RECOMMENDATION

Plaintiff saw Dr. Miller again on April 28, 2005. Tr. 137. Plaintiff reported that while taking Zyprexa, he continued to have diarrhea, but the twitching had gone away. Id. He also did not sleep well. Id. Plaintiff noted that he relapsed on alcohol one time, and reported feeling like he is always on the edge of relapse. Id.

Dr. Miller continued to assess plaintiff as suffering from bipolar disorder. Id. She wanted to try another mood stabilizer and this time prescribed Seroquel/quetiapine. Id. On May 5, 2005, at his next visit with Dr. Miller, plaintiff reported that he was constipated on the Seroquel, and also felt sleepy during the day. Tr. 136. He was resting well at night, however. Id. Dr. Miller smelled alcohol on plaintiff and asked him about his efforts to quit. Id. Plaintiff reported that he had had some "slip ups" and was bothered by it. Id. He felt that if he could get his depression under control, he could maintain sobriety better. Id.

Dr. Miller continued plaintiff on Seroquel, recommending that he take it at bedtime to minimize daytime sedation. Id. She also started him on Zoloft. Id. Her chart note states that she wrote a letter expressing her opinion that plaintiff has biploar disorder that has been untreated for years and would benefit from a psychiatric evaluation. Id.; Tr. 135 (copy of letter dated May 5, 2005).

On May 23, 2005, Dr. Miller saw plaintiff again. Tr. 134. Plaintiff had increased the Seroquel dosage, but reported feeling nervous and anxious during the day with problems sleeping, even though the Seroquel had initially helped him sleep better. Id. He felt sick with decreased energy. He experienced constipation

5 - FINDINGS & RECOMMENDATION

1   interspersed with bouts of diarrhea.  Id.  He noticed no
2   improvement from the Zoloft.  Id.  He reported that paying the co-
3   payment to see Dr. Miller was a problem.  Id.  She recommended
4   alternating visits between herself and "Roxanda" to help contain
5   costs.  Id.  Dr. Miller noted that plaintiff did not smell like
6   alcohol.  Id.

7       Dr. Miller remarked that plaintiff's bipolar disorder was
8   likely at sub-therapeutic doses of medication.  Id.  She increased
9   the Seroquel and gave him samples.  Id.  She also doubled the
10  Zoloft and recommended taking it in the morning to try to have a
11  calming effect.  Id.  She wanted him to follow up with Roxanda in
12  two weeks.  Id.

13      In an August 18, 2005 note made by Robert Henry, Ph.D in the
14  Disability Determination Services's (DDS) Development Summary
15  Worksheet, Dr. Henry notes that plaintiff was "evidently no longer
16  in treatment due to lack of funds."  Tr. 149.

17      On September 12, 2005, psychologist Thomas Shields, Ph.D.,
18  conducted a psychodiagnostic consultative examination of plaintiff
19  at the request of DDS.  Tr. 141-48.  Dr. Shields was asked to
20  address issues of bipolar disorder and alcohol abuse.  Tr. 141.
21  Dr. Shields reviewed the following records:  (1) an alcohol and
22  drug questionnaire completed by plaintiff on May 31, 2005; (2) an
23  alcohol and drug questionnaire completed by plaintiff's sister on
24  June 13, 2005; (3) a "function report" completed by plaintiff's
25  sister on June 13, 2005; (4) a "function report" completed by
26  plaintiff on May 31, 2005; (5) Dr. Miler's progress notes from
27  March 1, 2005 to May 5, 2005; and (6) the Three Rivers Community
28  Hospital emergency department report dated March 22, 2005.  Id.

6 - FINDINGS & RECOMMENDATION

1    Dr. Shields conducted the following evaluative procedures:
2    (1) a clinical interview; (2) a Mini-Mental Status Exam (MMSE); (3)
3    a Mental Status Examination (MSE); (4) the Beck Depression
4    Inventory, second edition; (5) the Beck Anxiety Inventory; (6) an
5    Index of Independence in Activities of Daily Living.  Id.

6    At the time he was interviewed by Dr. Shields, plaintiff
7    complained of frequent gastrointestinal problems of diarrhea or
8    constipation, regardless of his medication regimen.  Tr. 142.
9    Psychologically, he complained of bipolar disorder.  Id.  He
10   referred to his attempted suicide in March 2005 via intentional
11   alcohol overdose, and also claimed to have attempted suicide in
12   July 2005 via hanging, but, in his words, "the branch broke[.]"
13   Id.

14   Dr. Shields obtained a developmental and social history from
15   plaintiff, then proceeded to obtain a medical and psychiatric
16   history as well.  Tr. 142-43.  Plaintiff reported that he was
17   diagnosed with biploar disorder at the age of thirty-six, and had
18   been managed psychiatrically for a number of years on several
19   antidepressants.[1]  Tr. 143.  He reported that his typical
20   medications were Zoloft for depression, Zyprexa or Seroquel for
21   insomnia, and Librium for anxiety.  Id.  Dr. Shields noted that
22   "[p]er [plaintiff's] description, his 'bipolar disorder' is most
23   likely a Type 2 (depression and hypomania) Bipolar Disorder."  Id.
24   Plaintiff's current medication was 100 milligrams of Zoloft per
25   day.  Id.  He noted that he had been prescribed Seroquel for

26

27       [1]  The Administrative Record contains no records of a
     diagnosis at age thirty-six, nor of psychiatric management for a
28   number of years.

7 - FINDINGS & RECOMMENDATION

1  insomnia, but he "weaned" himself off of it.  Id.

2      On the MMSE, plaintiff scored in the general range of normal

3  cognitive functioning, but his age- and education-corrected "T-

4  score" fell within the low average classification range.  Id.  His

5  speech was monotone, but with normal rate and volume.  Tr. 144.

6  His responses to questions were coherent.  Id.  His capacity to

7  engage in conversational speech was adequate.  Id.  He was mildly

8  withdrawn, but cooperative, and his mood was mildly depressed.  Id.

9  He endorsed a number of depressive and anxiety symptoms, including

10 diminished energy levels, diminished interest levels, and poor

11 appetite, but also a fifteen pound weight gain in the past several

12 months.  Id.  He also reported problems with sleep.  Id.

13     On the Beck Depression Inventory, plaintiff's score fell

14 within the severe range of self-reported symptoms of depression.

15 Tr. 145.  His "item endorsements" included sadness, pessimism, past

16 failure, loss of pleasure, guilty feelings, self-dislike, suicidal

17 thoughts and wishes, agitation, loss of interest, indecisiveness,

18 worthlessness, loss of energy, changes in sleeping pattern,

19 irritability, changes in appetite, concentration difficulty,

20 tiredness or fatigue, and loss of interest in sex.  Id.

21     On the Beck Anxiety Inventory, plaintiff's score fell within

22 the moderate range of self-reported symptoms of anxiety.  Id.  His

23 "item endorsements" included feeling hot, wobbliness in legs,

24 unable to relax, fear of the worst happening, heart pounding or

25 racing, terrified, nervous, hands trembling, shaky, fear of losing

26 control, scared, indigestion or discomfort in abdomen, flushed, and

27 sweating not due to heat.  Id.

28     In the "comments" section of his report, Dr. Shields wrote

8 - FINDINGS & RECOMMENDATION

1    that plaintiff's statements appeared credible and consistent with

2    available collateral information.  Id.  Dr. Shields explained that

3    plaintiff "did not give the impression of malingering during this

4    interview, though it seems possible that he may be mildly

5    exaggerating/magnifying psychological symptoms." Id.  Dr. Shields

6    continued:

7           Specifically, his presentation did not coincide with the
            "severe" level of depression he endorsed on the self-
8           report inventory.  Furthermore, his description of his
            suicide attempt via hanging seemed more like a humorous
9           anecdote than a description of an attempt with a serious
            intent to die.  Note, however, any suicidal gesture
10          should not be taken lightly.  Nonetheless, I would
            estimate the severity of his current depressive episode
11          as falling within the mild-to-moderate range.

12   Id.

13         Dr. Shields noted that cognitively, plaintiff appeared able to

14   understand, remember, and carry out instructions for simple to

15   moderately difficult cognitive tasks.  Id.  While he demonstrated

16   some difficulty on the MMSE Serial 7s and Recall tasks, his overall

17   cognitive functioning was within normal limits for his age and

18   education.  Id.  He seemed capable of sustaining attention,

19   concentration and persistence adequately.  Id.

20         Dr. Shields noted that by history, plaintiff was capable of

21   sustained attention and persistence.  Id.  However, he stated,

22   plaintiff's primary complaint was that he became distressed after

23   several weeks and his mood symptoms exacerbated in such a way that

24   he was unable to hold a work routine.  Id.  Nonetheless, based on

25   plaintiff's presentation on that date, Dr. Shields saw no reason

26   why plaintiff should not be able to return to work with the

27   appropriate medication management.  Id.

28         Dr. Shields concluded that plaintiff's frustration tolerance

9 - FINDINGS & RECOMMENDATION

was "likely poor" and thus, elevated levels of work-related pressure might unduly tax his coping resources. Id. Nonetheless, at the present time, Dr. Shields wrote that in the presence of mild to moderate levels of work-related pressure, plaintiff seemed capable of enduring a fairly predictable routine without marked complication, especially if he remained abstinent from alcohol. Tr. at 145-46.

In terms of diagnoses, Dr. Shields stated that

records indicate a history of bipolar disorder, though there is no specification regarding the type. Per interview, he did not endorse a history of manic episodes unrelated to substance abuse. In contrast, his statements today created the impression of a recurrent pattern of depressive episodes, plausibly interspersed with a few hypomanic episodes. Thus, I have listed Bipolar II Disorder on Axis I on a provisional basis. It may require a good deal of time during which [plaintiff] remains consistently abstinent from alcohol to make the appropriate differential diagnosis (i.e. Bipolar II Disorder Vs. Major Depressive Disorder, Recurrent).

Id. at 146.

Dr. Shields listed plaintiff's Axis I diagnoses as alcohol dependence, in early partial remission per plaintiff's report, and Bipolar II Disorder, most recent episode depressed, mild-to moderate, provisional. Id. He also listed rule out major depressive disorder, recurrent, moderate, and history of polysubstance dependence. Id. He listed plaintiff's Global Assessment of Functioning (GAF) score as 60 currently. Id.

A psychiatric review technique form (PRTF), completed by DDS examiner Dorothy Anderson, Ph.D., and dated September 21, 2005, assessed plaintiff as having moderate impairments in activities of daily living, maintaining social functioning, and maintaining concentration, persistence, or pace. Tr. 153, 163. Dr. Anderson

10 - FINDINGS & RECOMMENDATION

1    also indicated that plaintiff had experienced one or two episodes
2    of decompensation, each of extended duration.    Id.

3        On the same date, Dr. Anderson completed a mental residual
4    functional capacity assessment.    Tr. 168-72.    She assessed
5    plaintiff as moderately limited in the ability to understand and
6    remember detailed instructions, moderately limited in the ability
7    to carry out detailed instructions, and moderately limited in the
8    ability to interact appropriately with the general public.    Tr.
9    168-69.  She noted that plaintiff was limited to understanding and
10   remembering short and simple instructions, was limited to carrying
11   out short and simple instructions, and was limited to brief,
12   structured public interaction due to limited frustration tolerance.
13   Tr. 170.

14   II.  Plaintiff's Hearing Testimony

15       Plaintiff initially testified about his past work experience.
16   Tr. 197-201.  He testified that he was not currently working at any
17   job, and that the last job he had was a part-time job a couple of
18   years earlier that did not work out.  Tr. 199.  At the time of the
19   hearing, plaintiff was not involved in any type of job training
20   services, either on his own or through the State of Oregon.    Tr.
21   201.

22       He had no sources of income, but he did live in an "old
23   dilapidated camper trailer" on his sister's property.  Tr. 201-02.
24   The camper has a small gas stove and a couple of lights.  He goes
25   to his sister's house to shower, which he states occurs only about
26   once per month.  Tr. 202.

27       Plaintiff testified that he spends his time watching
28   television and reading books.  Tr. 203.  He does not get out much.

11 - FINDINGS & RECOMMENDATION

1   Id.  Every now and then he goes to the store to get some food.  Id.
2   When the weather is good, he mows the lawns and takes care of his
3   sister's dogs.  Id.

4        At the time of the hearing, he was not seeing anyone for
5   healthcare services because, he explained, he could not afford it.
6   Id.  He stated that he "really" needed psychiatric treatment, but
7   could not afford it and was $75 or $80 in debt to the clinic in
8   Grants Pass.  Id.  He tried to apply to the Oregon Health Plan, but
9   it had been closed for a long time.  Id.  He had just learned that
10  it might be opening for enrollment again.  Id.  He also said he had
11  attempted to receive services from Jackson County Mental Health,
12  but they found him ineligible.  Tr. 209.  He did not offer an
13  explanation for his ineligibility other than to say that they
14  turned him down because they said he did not qualify for services.
15  Id.

16       Plaintiff described having previously been on Zoloft, but
17  quitting taking it because it made him sick, including giving him
18  bad diarrhea and making him feel more suicidal.  Tr. 204-05.  He
19  was taking no medications at the time of the hearing.  Id.
20  Plaintiff stated that he drinks alcohol every once in a while, when
21  he had money, which he said he generally does not have.  Tr. 206-
22  07.

23       When asked to describe what prevents him from working,
24  plaintiff responded that he would like to get on some medication
25  that would actually work for him that does not cause terrible side
26  effects.  Tr. 208.  He stated that he was terrified and had managed
27  to get himself into such a "spot" with his life in the last ten
28  years, and it was "just a mess."  Id.  He did not know how it could

12 - FINDINGS & RECOMMENDATION

1  be any worse.  Id.

2      The ALJ inquired if plaintiff had been given access to free

3  medications that doctors' offices sometimes received from drug

4  companies.  Id.  Plaintiff said yes, that was what he had been

5  trying in the past.  Id.  He also noted that the person he saw was

6  a general practitioner and he wanted to see a "real psychiatrist."

7  Id.

8  III.  Lay Witness Hearing Testimony

9      Plaintiff's sister, Christine Allen, accompanied plaintiff to

10  the hearing.  Tr. 190.  At the beginning of the hearing, the ALJ

11  confirmed that Allen was plaintiff's designated non-attorney

12  representative.  Tr. 192-93; see also Tr. 37-38 (form signed by

13  plaintiff on October 6, 2005, and Allen on October 16, 2005,

14  appointing Allen as plaintiff's non-attorney representative); Tr.

15  30 (requested for reconsideration signed by plaintiff and Allen as

16  his non-attorney representative); Tr. 25 (request for hearing by

17  ALJ signed by plaintiff and listing Allen's name as non-attorney

18  representative).

19      Allen also testified at the hearing.  Tr. 209-14.  According

20  to Allen, plaintiff is unable to hold onto a job because he is

21  depressive.  Tr. 210.  She noted a history of a few suicide

22  attempts and her efforts to help him by providing a free place to

23  stay.  Id.  She described him falling into a very depressive state

24  where he stays in bed for days, causing her to fear going to check

25  on him.  Id.  She also described plaintiff as being very slow and

26  fastidious about detail such that employers lose patience with him.

27  Id.

28      Allen described plaintiff's family history of bipolar disorder

13 - FINDINGS & RECOMMENDATION

1  and opined that plaintiff had suffered from it since high school.
2  Id.  She described his history of being able to function, "to a
3  certain extent," and for five to six years during his marriage, but
4  since that time, he has moved from one job to another, not being
5  stable in any one place, and living with one friend after another.
6  Id.  This pattern has lasted more than ten years.  Id.

7      Allen believes that if she did not provide housing on her
8  property, plaintiff would be living in the mountains in a car, "if
9  he had one."  Tr. 211.  She stated that he lived in horrible
10  squalor conditions except for the occasions when she has cleaned
11  out the camper trailer for him.  Id.

12     She is concerned about her inability to obtain medical care
13  for him.  Id.  She stated that she was hoping to get him mental
14  health help, but every time they hear about another possible
15  resource, plaintiff does not qualify for one reason or another.
16  Id.  She stated she was at her "wit's end" because she had tried
17  everything and every organization that she knew of to try and get
18  help and she has just "hit the end of the road as far as what I
19  know what to do."  Tr. 212.  She was not sure what medication would
20  help plaintiff at this point because he has terrible side effects
21  from what he has been on, and there have been suicide attempts.
22  Id.

23     The ALJ noted that he himself could not solve all of the
24  problems and could not provide medical services, but he suggested
25  that the "fastest or smartest" thing to do is to "link up" with the
26  Oregon Health Plan to see if plaintiff qualified.  Tr. 213.  Allen
27  responded that they planned on doing that.  Id.  The ALJ indicated
28  that he had also heard that the Oregon Health Plan was taking

14 - FINDINGS & RECOMMENDATION

1  applications, creating a waiting list, or "reenrolling or
2  something[.]"  Id.

3  IV.  Vocational Expert Testimony

4      Vocational Expert (VE) Frances Summers testified at the
5  hearing.  Tr. 215-21.  She first identified plaintiff's past work
6  as optical instrument assembler, semi-truck driver, delivery route
7  driver, and material handler.  Tr. 215-16.

8      The ALJ posed the following hypothetical to the VE:  a forty-
9  six year old individual with a GED with past work as identified by
10 the VE, and due to mental health issues is limited to remembering
11 and carrying out short, simple instructions, described as a
12 "simple, repetitive one, two, three-step occupation."  Tr. 216.
13 Additionally, the individual should have minimal contact with the
14 general public, with brief structured public interaction, which the
15 ALJ noted as "just sporadic or intermittent, no public service
16 occupations."  Id.  All the occupations would be skilled or semi-
17 skilled.  Id.

18     In response, the VE said the hypothetical individual could not
19 perform the identified past relevant work.  Tr. 217.  The ALJ then
20 added a limitation of no heavy lifting on a sustained basis.  Id.
21 The VE responded that with the additional limitation, the
22 individual would be able to perform the following occupations:
23 hand packager, dishwasher, rag sorter and cutter.  Id.

24     After the ALJ made sure that plaintiff understood what each of
25 these jobs could entail, he asked plaintiff if plaintiff could do
26 something easier and lighter than his past work, on a regular
27 basis.  Tr. 219.  Plaintiff indicated that he had actually done
28 work similar to the description of hand packager years ago, and

15 - FINDINGS & RECOMMENDATION

when the ALJ asked if plaintiff thought that it were possible today, plaintiff responded that he just did not have many good days. Id. He said mostly he has bad days. Id. He expressly referred to his need to get some medical help and his need to get on some kind of medication that would level out his mood and keep the anxiety, depression, and insomnia at bay. Tr. 219-20.

Currently, he explained, he goes for three or four days at a time with getting only thirty to forty-five minutes of sleep per day and then he is mentally exhausted from being tired. Tr. 220. He shuts down for two or three days at a time, not leaving his trailer. Id. He again stated that he really needed to be on some medication. Id.

Allen also responded to the VE's list of possible jobs by explaining that they were probably jobs that the plaintiff could do, but an employer could not count on plaintiff to be there on a regular basis because plaintiff was not dependable given "these states" that he goes into. Id. He will get up and go for a short period of time, but it does not last. Id.

THE ALJ'S DECISION

The ALJ first determined that plaintiff had not engaged in substantial gainful activity since his alleged June 4, 2004 onset date. Tr. 17. Next, the ALJ found that plaintiff has the following severe combination of impairments: bipolar II disorder, provisional; major depressive disorder, rule out; and history of alcohol and substance abuse, both in early remission. Id. However, the ALJ determined that plaintiff's impairments did not meet or equal, either singly or in combination, a listed impairment. Id. The ALJ also found that there was no evidence of

16 - FINDINGS & RECOMMENDATION

1  a medically determinable severe physical impairment.    Id.

2      The ALJ then determined plaintiff's residual functional
3  capacity (RFC) as being able to understand, remember, and carry out
4  only short, simple instructions with one-, two-, or three-step
5  tasks, and to have only brief structured public interactions
6  because of his withdrawn behavior and poor frustration tolerance in
7  response to increased work-related pressures.    Tr. 18.    Based on
8  this RFC, the ALJ found that plaintiff was unable to perform any of
9  his past relevant work, but he was able to perform jobs that exist
10  in significant numbers in the economy such as hand packager,
11  dishwasher, and rag sorter or cutter.    Tr. 21.    Accordingly, the
12  ALJ concluded that plaintiff was not disabled.    Tr. 22.

13              STANDARD OF REVIEW & SEQUENTIAL EVALUATION

14      A claimant is disabled if unable to "engage in any substantial
15  gainful activity by reason of any medically determinable physical
16  or mental impairment which . . . has lasted or can be expected to
17  last for a continuous period of not less than 12 months[.]"    42
18  U.S.C. § 423(d)(1)(A).    Disability claims are evaluated according
19  to a five-step procedure.    Baxter v. Sullivan, 923 F.2d 1391, 1395
20  (9th Cir. 1991).    The claimant bears the burden of proving
21  disability.    Swenson v. Sullivan, 876 F.2d 683, 687 (9th Cir.
22  1989).    First, the Commissioner determines whether a claimant is
23  engaged in "substantial gainful activity."    If so, the claimant is
24  not disabled.    Bowen v. Yuckert, 482 U.S. 137, 140 (1987); 20
25  C.F.R. §§ 404.1520(b), 416.920(b).    In step two, the Commissioner
26  determines whether the claimant has a "medically severe impairment
27  or combination of impairments."    Yuckert, 482 U.S. at 140-41; see
28  20 C.F.R. §§ 404.1520(c), 416.920(c).    If not, the claimant is not

17 - FINDINGS & RECOMMENDATION

1  disabled.

2      In step three, the Commissioner determines whether the
3  impairment meets or equals "one of a number of listed impairments
4  that the [Commissioner] acknowledges are so severe as to preclude
5  substantial gainful activity." Yuckert, 482 U.S. at 141; see 20
6  C.F.R. §§ 404.1520(d), 416.920(d).  If so, the claimant is
7  conclusively presumed disabled; if not, the Commissioner proceeds
8  to step four. Yuckert, 482 U.S. at 141.

9      In step four the Commissioner determines whether the claimant
10 can still perform "past relevant work." 20 C.F.R. §§ 404.1520(e),
11 416.920(e).  If the claimant can, he is not disabled.  If he cannot
12 perform past relevant work, the burden shifts to the Commissioner.
13 In step five, the Commissioner must establish that the claimant can
14 perform other work. Yuckert, 482 U.S. at 141-42; see 20 C.F.R. §§
15 404.1520(e) & (f), 416.920(e) & (f).  If the Commissioner meets his
16 burden and proves that the claimant is able to perform other work
17 which exists in the national economy, he is not disabled.  20
18 C.F.R. §§ 404.1566, 416.966.

19     The court may set aside the Commissioner's denial of benefits
20 only when the Commissioner's findings are based on legal error or
21 are not supported by substantial evidence in the record as a whole.
22 Baxter, 923 F.2d at 1394.  Substantial evidence means "more than a
23 mere scintilla," but "less than a preponderance." Id.  It means
24 such relevant evidence as a reasonable mind might accept as
25 adequate to support a conclusion. Id.

26                            DISCUSSION

27     Plaintiff alleges that the ALJ erred in (1) rejecting
28 plaintiff's testimony, (2) failing to consider plaintiff's sister's

18 - FINDINGS & RECOMMENDATION

testimony, (3) formulating the RFC without considering all of plaintiff's restrictions, (4) presenting an invalid hypothetical to the VE, and (5) failing to fully and fairly develop the record.  I address the arguments in turn.

I.  Plaintiff's Testimony

    The ALJ is responsible for determining credibility.  <u>Andrews v. Shalala</u>, 53 F.3d 1035, 1043 (9th Cir. 1995).  Once a claimant shows an underlying impairment and a causal relationship between the impairment and some level of symptoms, clear and convincing reasons are needed to reject a claimant's testimony if there is no evidence of malingering.  <u>Smolen v. Chater</u>, 80 F.3d 1273, 1281-82 (9th Cir. 1996).  When determining the credibility of a plaintiff's complaints of pain or other limitations, the ALJ may properly consider several factors, including the plaintiff's daily activities, inconsistencies in testimony, effectiveness or adverse side effects of any pain medication, and relevant character evidence.  <u>Orteza v. Shalala</u>, 50 F.3d 748, 750 (9th Cir. 1995).  The ALJ may also consider the ability to perform household chores, the lack of any side effects from prescribed medications, and the unexplained absence of treatment for excessive pain.  <u>Id.</u>

    Here, in determining plaintiff's RFC, the ALJ cited plaintiff's testimony that he could perform no work because of his mental inability to function as a result of feeling terrified and severely depressed, causing him to stay in bed for days.  Tr. 19.  The ALJ noted the testimony that plaintiff was slow and overly fastidious in performing tasks, that he no longer took psychotropic medications because of an inability to afford them and adverse side effects, and his failure to regularly shower and clean the camper

19 - FINDINGS & RECOMMENDATION

1  trailer in which he lived.    Id.    The ALJ gave three reasons for
2  rejecting plaintiff's subjective limitations:    (1) it was not
3  supported by the vocational and psychiatric evidence; (2) it was
4  inconsistent with his daily activities; (3) plaintiff's failure to
5  follow treatment was inexplicable.

6      The ALJ first reasoned that plaintiff's testimony was
7  unsupported by the "full vocational and psychiatric evidence."    Id.
8  He noted that as of the alleged onset date, plaintiff had sixteen
9  years of responsible work with continuous good annual earnings,
10 except in 2002, as a result of ten years at a skilled optical job
11 and seven years performing two semi-skilled driver and delivery
12 jobs.    Id.    He next noted that on March 22, 2005, plaintiff
13 reported a lengthy history of alcoholism with one participation,
14 unsuccessfully, in a rehabilitation program several years earlier.
15 Id.    This, the ALJ stated, was in "stark contrast" to plaintiff's
16 sustained, high-functioning, vocational history.    Id.    And, the ALJ
17 noted, although Dr. Miller initially suspected that plaintiff's
18 symptoms were consistent with depression, she ultimately diagnosed
19 him with a bipolar disorder which had been untreated
20 psychiatrically for years, which, the ALJ implied, was also
21 inconsistent with plaintiff's long-standing work history.    Id.

22     The ALJ also cited to Dr. Shields's September 2005 evaluation
23 where despite a provisional diagnosis of bipolar II disorder, a
24 noted history of alcohol dependence in early partial remission, a
25 history of polysubstance dependence, as well as a rule out moderate
26 recurrent major depressive order, Dr. Shields still opined that
27 plaintiff retained the abilities to understand, remember, and carry
28 out moderately difficult tasks; was able to adequately sustain

20 - FINDINGS & RECOMMENDATION

attention, concentration, or pace; and could function cognitively in the normal range.  Id.  And, the ALJ noted that in regard to plaintiff's capacity to work, Dr. Shields had found that plaintiff had a poor frustration tolerance in response to elevated work-related pressure, and a withdrawn, albeit mild, behavioral interaction with others such that plaintiff's mental capacities to cope were expected to be unduly taxed in such a work setting.  Id.

Next, the ALJ found plaintiff's admitted daily activities to be inconsistent with any disabling mental impairment.  Tr. 20.  He noted plaintiff's ability to read books, watch television, occasionally shop for groceries, and perform yard work in the summer for his sister.  Id.  The ALJ further noted that plaintiff had no current legal problems, nor any relevant substance abuse convictions aside from one remote DUI in 1985, which, subsequent thereto, the ALJ noted, plaintiff obtained and maintained a valid commercial driver's license.  Id.  He was also able to borrow and drive his sister's truck when needed.  Id.

Finally, the ALJ explained that

> [s]imply put, the undersigned finds that the claimant has fairly normal overall mental functioning in spite of his inexplicable reasons for electing to not [] follow through with medically directed therapeutic and psychotropic intervention.  In regards thereto, the claimant and his sisters' testimony to his alleged lack of access to mental health care provided free of charge through the State of Oregon Health Plan is implausible. Furthermore, the claimant credibly testified that even without accessing this free health care he had reduced substantially his use of alcohol to no more than occasionally.

Id.

Plaintiff argues that the ALJ erred in several respects. First, plaintiff contends that the ALJ erred in assuming, with no

21 - FINDINGS & RECOMMENDATION

explanation, that plaintiff could have received free health care through the State of Oregon.  As explained by plaintiff and Allen, the Oregon Health Plan has been closed to new applicants for mental health services for years and plaintiff had been rejected by other treatment providers such as Jackson County Mental Health.

Second, plaintiff argues that his daily activities show that he can engage in only sporadic work activity and do not support a finding that he can sustain work activity for eight hours a day, five days for week, or an equivalent full-time schedule.  Plaintiff notes well-established caselaw stating that the ability to "assist with some household chores [is] not determinative of disability." Cooper v. Bowen, 815 F.2d 557, 561 (9th Cir. 1987); see also Vertigan v. Halter, 260 F.3d 1044, 1050 (9th Cir. 2001) ("mere fact that a plaintiff has carried on certain daily activities, such as grocery shopping, driving a car, or limited walking for exercise, does not in any way detract from her credibility as to her overall disability"); Fair v. Bowen, 885 F.2d 597, 603 (9th Cir. 1989) ("The Social Security Act does not require that claimants be utterly incapacitated to be eligible for benefits[.]"); Smith v. Califano, 637 F.2d 968, 971 (3d Cir. 1981) ("Disability does not mean that a claimant must vegetate in a dark room excluded from all forms of human and social activity.").

Third, plaintiff contends that the ALJ inappropriately relied on plaintiff's previous ability to work before plaintiff's alleged onset date which, plaintiff argues, ignores plaintiff's deteriorating mental health preventing him from sustaining work. While plaintiff previously may have been able to engage in sustained work activity, he notes that he was unable to work for an

22 - FINDINGS & RECOMMENDATION

extended period in 2003, was able to work only half the year in 2004, worked only a few weeks in 2005, only part-time in 2006, and was unable to work at all in 2007 and 2008. Plaintiff cites to Dr. Shields's report in which Dr. Shields described plaintiff's pattern of attempting to work for a few weeks, then becoming distressed after several weeks which exacerbated his mood symptoms preventing him from enduring a work routine.

I agree with plaintiff that the ALJ erred in rejecting his subjective testimony. The fact that he was able work full-time for many years while possibly suffering from undiagnosed bipolar disorder is not a legitimate basis for rejecting testimony that he can no longer perform such sustained activity because of his deteriorating mental illness. The record shows that plaintiff was able to cope with full-time work, marriage, and parenthood for a number of years, but eventually, lost the ability to participate in any of those endeavors in a meaningful way.

The ALJ failed to discuss the evidence in the record that plaintiff's condition has deteriorated, and thus, the ALJ erred in comparing plaintiff's pre-onset date ability to work with his post-onset date alleged inability to sustain full-time work activity, without at least some discussion as to whether the difference is attributable to a worsening condition. E.g., Social Sec. Ruling (SSR) 96-7p, 1996 WL 374186, at *5 (noting that symptoms may vary in their intensity and functional effects, or may worsen over time and thus, the adjudicator must review the record to determine if there is an explanation for variations in symptoms and effects).

Additionally, while the ALJ properly noted Dr. Shields's opinion that plaintiff retained abilities to understand, remember,

23 - FINDINGS & RECOMMENDATION

and carry out moderately difficult tasks and to adequately sustain
attention, concentration, and persistence, the ALJ also expressly
recognized Dr. Shields's finding of a poor frustration tolerance in
response to elevated work-related pressure and a withdrawn
behavioral interaction which would "unduly tax" plaintiff's mental
abilities to cope in a work setting.   Moreover, Dr. Shields's
evaluation made clear that in his opinion, plaintiff's ability to
engage in sustained work activity depended on proper medication
management which plaintiff is obviously not receiving.   Thus,
plaintiff's testimony regarding his inability to work full-time is
not contradicted by Dr. Shields's report.

Second, as the cases recognize, the ability to engage in
certain activities such as reading and watching television are not
inconsistent with a claim of disability, nor is the ability to
borrow a truck and drive it, and perform some seasonal yard work.
E.g., Orn v. Astrue, 495 F.3d 625, 639 (9th Cir. 2007) (ALJ erred
by relying on claimant's daily activities of reading, watching
television, and coloring in coloring books as basis for adverse
credibility determination when the activities did not contradict
the claimant's other testimony and did not meet the threshold for
transferable work skills).

Here, the record does not support the ALJ's conclusion that
plaintiff's limited daily activities are inconsistent with his
testimony.   And, the activities of reading, watching television,
occasional grocery shopping, and the ability to do some seasonal
yard work for a family member, do not demonstrate transferable work
skills.   As in Orn, and the other cases cited above, the ALJ here
erred when relying on these daily activities as a basis to reject

24 - FINDINGS & RECOMMENDATION

1  plaintiff's testimony.

2      Finally, the ALJ offers no support whatsoever for his
3  disbelief of plaintiff's attempts to receive mental health care
4  through the Oregon Health Plan.  Relevant caselaw holds that an
5  inability to afford treatment may not be used against a claimant.
6  E.g., Orn, 495 F.3d at 638 (claimant's failure to receive medical
7  treatment during the period that he had no medical insurance cannot
8  support an adverse credibility finding); Gamble v. Chater, 68 F.3d
9  319, 321 (9th Cir. 1995) ("[d]isability benefits may not be denied
10 because of the claimant's failure to obtain treatment he cannot
11 obtain for lack of funds.").

12     Here, the ALJ asserts that plaintiff's and his sister's
13 testimony that plaintiff was unable to obtain mental health care
14 from the Oregon Health Plan is implausible.  But, the ALJ offers no
15 authority for this assertion.

16     Although the ALJ determines credibility, as noted above he
17 must offer clear and convincing reasons to reject plaintiff's
18 testimony when there is no evidence of malingering.  Holohan v.
19 Massanari, 246 F.3d 1195, 1208 (9th Cir. 2001).  SSR 96-7p makes
20 clear that the ALJ may not simply offer conclusory statements such
21 as "the allegations are not credible."  SSR 96-7p, 1996 WL 374186,
22 at *2.  The finding of credibility may not be based on "an
23 intangible or intuitive notion" but must be "grounded in the
24 evidence" and "supported by evidence in the case record."  Id. at
25 *4.

26     The ALJ's implausibility finding regarding plaintiff's
27 attempts to secure benefits through the Oregon Health Plan is
28 distinguishable from an ALJ finding complaints of pain or other

25 - FINDINGS & RECOMMENDATION

symptoms exaggerated or implausible because they are not supported by the objective medical evidence or are contradicted by activities of daily living. In those circumstances, the ALJ has supported an implausible finding by citing to clear and convincing reasons in the record. Here, the ALJ offers no evidence of any kind in the record regarding the availability of benefits of the Oregon Health Plan during the relevant period. Thus, without some authority for his position that plaintiff and his sister are lying about the coverage that the ALJ thinks was available to plaintiff at the relevant time, it was error to find plaintiff's testimony unbelievable on this basis.

II. Lay Witness Testimony

Although plaintiff's sister offered testimony at the hearing regarding plaintiff's activities and limitations, and submitted a third-party written report of plaintiff's functioning, Tr. 98-105, the only reference to her oral or written testimony by the ALJ in his decision is his statement that her assertion of the inability to obtain mental health care for plaintiff through the Oregon Health Plan is implausible. The ALJ's failure to even discuss her testimony regarding plaintiff's activities and alleged limitations is error. E.g., Stout v. Commissioner, 454 F.3d 1050, 1056 (9th Cir. 2006) (disregard of lay witness testimony is error).

III. Formulation of the RFC

Plaintiff contends that the ALJ's RFC fails to include all of plaintiff's limitations, rendering it incomplete and thus, based on legal error. Plaintiff cites to SSR 96-7p which indicates that in assessing a plaintiff's subjective statements about symptoms and their effects, the ALJ should consider the type, dosage,

26 - FINDINGS & RECOMMENDATION

effectiveness, and side effects of any medication the claimant takes. 1996 WL 374186, at *3. The ALJ, as noted above, rejected plaintiff's subjective testimony and thus, had no reason to include plaintiff's statements about the nature and severity of any medication side effects in his RFC. Unless the ALJ on remand can properly support the rejection of plaintiff's statements, the ALJ must consider the effectiveness of any medications, their side effects, and any limitations they cause, as part of the RFC.[2]

Plaintiff further argues that the limitations of short, simple instructions and tasks, and brief, structured public interactions, do not capture the limitations caused by his bipolar disorder. He notes that Dr. Shields's description of his withdrawn behavior, poor tolerance for frustration, and exacerbation of mood symptoms after several weeks of working, was not limited to situations of working with the public. Thus, plaintiff argues the ALJ should address how plaintiff's low frustration tolerance would negatively affect his ability to interact with coworkers and supervisors.[3] I

_____

[2] The Court notes that as long as plaintiff has no available avenues for mental health treatment and medications, he is apparently taking no medication (as he testified at the hearing), and thus, he would have no medication side effects.

[3] Although Dr. Shields made no mention of plaintiff's limitation being restricted to interactions with the public, non-examining DDS examiner Dr. Anderson assessed plaintiff as being moderately limited in the ability to interact appropriately with the general public. Tr. 169. In his decision, however, the ALJ relies on Dr. Shields's findings of "withdrawn behavior and poor frustration tolerance in response to increased work-related pressures" in support of restricting plaintiff to "brief structured public interactions[.]" Tr. 18. The ALJ later notes that Dr. Anderson's assessment is "nearly identical" to Dr. Shields's, but, as noted, Dr. Shields does not limit the exacerbation of plaintiff's symptoms to jobs that require

27 - FINDINGS & RECOMMENDATION

1  agree.

2

3  IV.  Invalid Hypothetical

4      Plaintiff argues that the hypothetical to the VE was invalid

5  because it failed to address (1) limitations described by plaintiff

6  and his sister, (2) medication side effects, and (3) the

7  appropriate limitations suggested by Dr. Shields's report and

8  caused by plaintiff's poor frustration tolerance, withdrawn

9  behavior, and decompensation in response to stress.

10     The hypothetical is derived from the RFC. Valentine v.

11 Commissioner, 574 F.3d 685, 690 (9th Cir. 2009). To be valid, the

12 hypothetical presented to the VE must incorporate all of a

13 plaintiff's limitations. Id. Here, because the ALJ must reassess

14 several issues which may require the incorporation of certain

15 limitations in his RFC, his hypothetical to the VE may well be

16 defective and cannot, at this point, be the basis for his

17 conclusion.

18 V.  Failure to Fully Develop the Record

19     Plaintiff contends that the ALJ erred in "finding" Allen a

20 non-attorney representative. From that premise, plaintiff argues

21 he was not, in fact, represented at the hearing, and the ALJ had a

22 heightened duty to fully develop the record which he failed to do.

23 I disagree.

24     The ALJ stated that plaintiff was represented by Allen, a non-

25 attorney representative. Tr. 15. Putting aside whether this is an

26 actual "finding" by the ALJ (the ALJ's statement appears in the

27 _____

28 encounters with the public.

28 - FINDINGS & RECOMMENDATION

section titled "JURISDICTION AND PROCEDURAL HISTORY), there is no inaccuracy in the ALJ's statement.

As indicated above, plaintiff and his sister both signed Social Security Administration Form SSA-1696-U4, for appointment of a representative, in October 2005.  Tr. 37-38 (form signed by plaintiff on October 6, 2005, and Allen on October 16, 2005, appointing Allen as plaintiff's non-attorney representative).  On that same date, Allen signed plaintiff's request for reconsideration as his non-attorney representative.  Tr. 30. Subsequently, plaintiff listed Allen as his non-attorney representative in his March 2006 request for a hearing.  Tr. 25. Finally, the ALJ confirmed orally at the hearing with Allen that she was plaintiff's representative and that she had "signed and so on." Tr. 192.  The ALJ then explained the function of such a representative to Allen.  Tr. 192-93.  The ALJ was aware that Allen was plaintiff's sister.  E.g., Tr. 201 (asking plaintiff to confirm that he lived on his sister's property whom he then identified as "Ms. Allen").

Plaintiff contends that "Christine Allen is Plaintiff's sister . . . and is not a 'non-attorney' representative' as that term normally is used to refer to qualified persons who have extensive knowledge of applicable statutes, regulations, rulings, and other applicable legal authority." Pltf's Op. Brief at p. 8.  Notably, plaintiff offers no authority for this assertion and the Court has found none.  In fact, the relevant regulation provides that a claimant may appoint a non-attorney to be his or her representative if the person:

(1) Is generally known to have a good character and

29 - FINDINGS & RECOMMENDATION

1  reputation;
   (2) Is capable of giving valuable help to you in
2  connection with your claim;
   (3) Is not disqualified or suspended from acting as a
3  representative in dealing with us; and
   (4) Is not prohibited by any law from acting as a
4  representative.

5  20 C.F.R. §§ 404.1705(b), 416.1505(b).

6      Nothing in the record suggests that Allen was prohibited from

7  representing plaintiff.

8      The ALJ has a duty to develop the record whether the claimant

9  is or is not represented by counsel. Smolen, 80 F.3d at 1288 (duty

10 to fully and fairly develop the record and to assure that

11 claimant's interests are considered exists even when claimant is

12 represented by counsel). The duty is heightened, however, when the

13 claimant is not represented by counsel. E.g., Higbee v. Sullivan,

14 975 F.2d 558, 561 (9th Cir. 1992); see also DeLorme v. Sullivan,

15 924 F.2d 841, 849 (9th Cir. 1991) (noting that in cases of mental

16 impairments, the duty to fully develop the record is especially

17 important).

18     Although plaintiff argues that the ALJ's "error" of "finding"

19 Allen to be a non-attorney representative caused the ALJ to fail in

20 his duty to fully and fairly develop the record, plaintiff does not

21 explain how the ALJ failed in this regard. Plaintiff contends that

22 he was prejudiced by the lack of counsel in that he was deprived of

23 the right to an impartial decision based on an adequate record.

24 Pltf's Op. Brief at p. 9. He notes that his medical records show

25 that he has not been able to afford treatment and that medication

26 samples have been marginally effective and caused side effects.

27 Id. Then, plaintiff asserts that instead of assisting plaintiff in

28 fully and fairly developing the record, the ALJ "speculatively

30 - FINDINGS & RECOMMENDATION

faulted" plaintiff for not pursuing free psychiatric care through the Oregon Health Plan. Id. While I agree with plaintiff that the ALJ erred in rejecting plaintiff's and Allen's testimony on the basis of his disbelief regarding the care available through the Oregon Health Plan, I do not agree this represents an instance of the ALJ's "failure to develop the record."

VI. Remand

Plaintiff argues that the case should be remanded with an award of benefits. The ALJ erroneously evaluated plaintiff's and Allen's credibility. The decision whether to remand for further proceedings or for immediate payment of benefits is within the discretion of the court. Harman v. Apfel, 211 F.3d 1172, 1178 (9th Cir. 2000). The issue turns on the utility of further proceedings. A remand for an award of benefits is appropriate when no useful purpose would be served by further administrative proceedings or when the record has been fully developed and the evidence is insufficient to support the Commissioner's decision. Rodriguez v. Bowen, 876 F.2d 759, 763 (9th Cir. 1989).

Under the "crediting as true" doctrine, evidence should be credited and an immediate award of benefits directed where "'(1) the ALJ has failed to provide legally sufficient reasons for rejecting such evidence, (2) there are no outstanding issues that must be resolved before a determination of disability can be made, and (3) it is clear from the record that the ALJ would be required to find the claimant disabled were such evidence credited.'" Harman, 211 F.3d at 1178 (quoting Smolen, 80 F.3d at 1292). The "crediting as true" doctrine is not a mandatory rule in the Ninth Circuit, but leaves the court flexibility in determining whether to

31 - FINDINGS & RECOMMENDATION

1   enter an award of benefits upon reversing the Commissioner's

2   decision.  Connett v. Barnhart, 340 F.3d 871, 876 (9th Cir. 2003)

3   (citing Dodrill v. Shalala, 12 F.3d 915, 919 (9th Cir. 1993));

4   Nguyen v. Chater, 100 F.3d 1462, 1466-67 (9th Cir. 1996); Bunnell

5   v. Sullivan, 947 F.2d 341, 348 (9th Cir. 1991).

6       Here, the ALJ failed to properly evaluate plaintiff's and his

7   sister's testimony.  The RFC failed to adequately reflect

8   plaintiff's limitations.  As a result, the ALJ also failed to

9   solicit appropriate testimony from the vocational expert regarding

10  the effect of plaintiff's additional limitations.  And, likely

11  because she is a non-attorney, Allen additionally failed to solicit

12  testimony from the vocational expert stemming from the improperly

13  addressed evidence.

14      In instances where the VE has not offered evidence regarding

15  the vocational options, if any, when all of a claimant's

16  limitations are presented to the VE, an award of benefits is

17  inappropriate.  Harman, 211 F.3d at 1180 (noting that "[i]n cases

18  where the testimony has failed to address a claimant's limitations

19  as established by improperly discredited evidence, we consistently

20  have remanded for further proceedings rather than payment of

21  benefits.").  The matter must be remanded for further proceedings

22  addressing the improperly evaluated evidence cited above.  Id.  If

23  necessary, the ALJ must then revise the RFC analysis and apply the

24  correct medical-vocational guideline or obtain vocational expert

25  testimony regarding plaintiff's workplace limitations.

26  Additionally, in this case, it may be that plaintiff has found a

27  source of treatment for his illness at a clinic or through the

28  Oregon Health Plan, which, as the ALJ, plaintiff, and Allen

discussed at the hearing, was possibly opening its rolls to new clients around the time of the hearing.  If plaintiff has any updated medical records, the ALJ should consider them on remand. Finally, the ALJ must make adequate step four and five findings incorporating any revised findings.

CONCLUSION

The Commissioner's decision should be reversed and remanded for further proceedings.

SCHEDULING ORDER

The Findings and Recommendation will be referred to a district judge.  Objections, if any, are due September 14, 2010.  If no objections are filed, then the Findings and Recommendation will go under advisement on that date.

If objections are filed, then a response is due October 1, 2010.  When the response is due or filed, whichever date is earlier, the Findings and Recommendation will go under advisement.

IT IS SO ORDERED.

Dated this 25th  day of August , 2010.


/s/ Dennis J. Hubel

_____
Dennis James Hubel
United States Magistrate Judge

33 - FINDINGS & RECOMMENDATION